**COUNTY OF MERCER**

v.

**TEAMSTERS LOCAL 250, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Feb. 11, 2008.

Decided April 8, 2008.

Ernest B. Orsatti, Pittsburgh, for appellant.

Christopher P. Gabriel, Pittsburgh, for appellee.

BEFORE: LEADBETTER, President Judge, PELLEGRINI, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

The Teamsters Local Union No. 250 (Union) appeals from a decision of the Court of Common Pleas of Mercer County (trial court) which vacated the March 2, 2006 arbitration award of arbitrator John M. Felice (Arbitrator). The Arbitrator had reinstated Sergeant Walter J. Weir, Jr. (Grievant) to the Mercer County Jail (Jail) with back pay. We reverse the trial court.

Grievant was employed by the County of Mercer (County) as a sergeant in the Jail. On May 15, 2005, while Grievant was on duty and serving as the supervisor, Wayne Steen (Steen), a fellow corrections officer, brought a quantity of pipe tobacco into the Jail. Steen was aware that pipe tobacco is contraband in the Jail and stated that he accidentally left the tobacco in his jacket pocket when he reported for work that day. Steen left his jacket hanging in the medical room for a short period of time and when he returned, he found that the tobacco had been stolen. Steen reported the theft to Grievant.

During the time in which Steen's tobacco was stolen, Grievant had allowed an inmate, Mr. Anderson, to be in the medical room alone with a visiting female nurse. A report later prepared by Steen indicates that Grievant did not inform him that Anderson had been in the medical room unescorted by a corrections officer. Grievant stated that he did not inform Steen of this fact, as it "slipped [his] mind." Notes of Testimony (N.T.) at 206; Reproduced

Record (R.R.) at 291a. Grievant also stated that he did tell the deputy warden about it but did not include this information in his written report because the deputy warden chewed him out for letting it happen. N.T. at 206; R.R. at 291a.

Grievant ordered a general search of the entire cell block for the missing tobacco. The search resulted in Anderson being found with the tobacco. A second inmate informed Grievant that Anderson had stolen the tobacco. Thereafter, Grievant told Anderson that, "I'm not going to write you up for this incident ... [b]ut I need to know [if you stole the tobacco]." N.T. at 196; R.R. at 281a. During the night of May 15, 2005, news of this exchange spread throughout the prison and ultimately led to an incident the following morning involving Deputy Warden Morganstern.

When Morganstern reported to work the following morning, an inmate asked him why nothing was being done about the inmate who had stolen tobacco the previous evening. Morganstern conducted an investigation. Standing/Post Orders require all corrections officers involved in an incident to file a report by the end of their shift, as it informs supervisory employees of any incidents and it also places the rank-and-file employees working the next shift on notice that misconduct occurred on the previous shift. The only exception to this requirement is that corrections officers may file reports the following day if it is impractical for them to file the reports by the end of their shift because there is no time due to other duties. All of the officers, including Grievant, failed to file a report by the end of their shifts.[1] Mor-

---

1. Grievant testified that he did not file a report that night because "I was going to talk to the warden—deputy warden about it 'cause I'm shop steward and I truthfully didn't know how to handle the situation." N.T. at 197; R.R. at 282a. When he talked to Morganstern the next day, Grievant had written notes

ganstern interviewed Steen and another corrections officer, Mathew Ray, separately. Both Steen and Ray reported to Morganstern that Grievant had instructed them not to file reports. All officers were disciplined for failure to file a timely report.[2]

By letter dated June 23, 2005, Grievant was discharged effective June 9, 2005. The letter stated in pertinent part as follows:

You have been terminated as an employee of Mercer County Jail on June 9, 2005 for the following reasons:

● Falsification of reports

● Violations of policy and procedures by failing to file reports relative to the May 15th incident and for not notifying or forwarding to the Administration any report relative to the 5/15 incident in a timely manner.

● Improper Conduct:

Told subordinates not to file paperwork relative to the May 15th incident

Told inmate that no misconduct form would be Issued

● Filing a report that was inaccurate, incomplete, false and/or misrepresented the facts of the incident

● Not forthcoming with County Personnel during the investigation of this matter

● Misrepresented the facts of the matter to the Mercer County Prison Board at the "Due Process Hearing."

These violations are against various sections of the "SOP Manual" for the Mercer county Jail, the "Standing/Posted Orders" for the Mercer County Jail and the Mercer County Jail Code of Ethics.

but Morganstern told Grievant he wanted a typed report.

The Union filed a grievance on behalf of Grievant, protesting the discharge. The grievance was processed through the contractual grievance procedure and ultimately submitted to arbitration. A hearing was held on October 28, 2005. The Arbitrator found in pertinent part as follows:

The Grievant's failure to file a report on the 15th is not fatal in the instant case since his intention was to meet with Morganstern on the 16th, which he did, to ascertain how to handle the situation because it was unique and it involved another Corrections Officer. The Grievant did present his handwritten notes to Morganstern, who rejected them, and he produced a typed copy on May 16. Unrebutted testimony revealed that many times incidents are not reported until the next day.

* * *

In the instant case, there was no evidence the Grievant falsified any record.

* * *

There was no evidence adduced in the hearing to confirm that the Grievant falsified any information in his report to Morganstern. The only testimony in this regard came from Morganstern who "believed the report was false".

The record does not support a finding that the Grievant's conduct set an example to subordinates and other inmates that the proper way to deal with an incident such as that disputed herein is to cover it up nor did he engage in any criminal act or hinder apprehension by actively participating and covering up the crime of theft and the possession of contraband by an inmate.

2. Steen received a 5–day suspension, Ray received a 30–day suspension and Officer Thomas Schaffer, a probationary employee, had his employment terminated.

Based on the facts and circumstances prevailing in the instant case, the Grievant was not discharged for just cause. Arbitrators' award (A.A.) at 7–8; R.R. at 83a–84a. The Arbitrator further found Steen and Ray not credible when they testified that Grievant had instructed them on May 15, 2005, to "cover up" the stolen tobacco incident. The Arbitrator determined that because the evidence did not establish that Grievant acted as charged and that Grievant's actions did not strike at the core functions of the Jail, his discharge was without just cause. A.A. at 8; R.R. at 84a. On March 3, 2006, the Arbitrator issued his award reinstating Grievant with back pay.

On March 31, 2006, the County filed a petition with the trial court to vacate the Arbitrator's award. A hearing was held before the trial court on December 12, 2006. The trial court reversed the Arbitrator's award, finding that the Arbitrator ignored wrongdoing admitted to by Grievant; and that Grievant "admitted on the record that he had permitted an inmate named Anderson to be in the medical room alone with a visiting nurse in violation of Jail policy. [Grievant] admitted filing an inaccurate or incomplete report about an officer being stationed with the nurse while she treated Anderson." Trial court decision at 4. The trial court further found that Grievant "admitted that he had violated Jail policy by telling an inmate that he would not write him up for the offense." Trial court decision at 5.

The trial court determined that "the misconduct of [Grievant] in violating Jail policy by telling the prisoner that he would not be punished for taking and/or possessing the contraband and in permitting the prisoner to be in the medical room alone with the nurse strikes at the County's ability to maintain and operate a Jail." Trial court decision at 5. The trial court determined that the Arbitrator's award could not be rationally derived from the collective bargaining agreement (CBA), as "[i]t ignores the fact that the employee's conduct was both illegal and directly related to the employee's role in carrying out the employing agency's function." Trial court decision at 6. The trial court found that the Arbitrator ignored wrongdoing admitted to by Grievant and determined that the Arbitrator's award could not be rationally derived from the CBA, as Grievant's conduct compromised the prison system to such an extent that its ability to perform its core functions was impaired.[3] The trial court vacated the Arbitrator's award and the Union, thereafter, appealed to our court.

Before our court, the Union contends that the trial court erred as a matter of law in applying the extremely narrow scope of judicial review of a labor arbitration award, that the arbitration award was rationally derived from and drew its essence from the CBA and that the arbitration award does not violate a well defined and dominant public policy.

■ Before addressing the issues of this case, we observe that subsequent to the trial court issuing its decision, our Supreme Court issued a decision in *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support*

---

3. The CBA provides in Section XVIII, Suspension and/or Discharge as follows:

The Employer shall have the right to suspend and/or discharge an employee for just cause. Just cause shall include, but shall not be limited to, the following types of infractions: gross insubordination, stealing, the use or possession of or under the influence of alcohol or drugs on the premises, falsification of records, unauthorized possession of weapons, improper conduct to, or abuse of, an inmate.

*Personnel Association, PSEA/NEA,* —— Pa. ——, 939 A.2d 855 (2007), addressing the judicial review of arbitration awards. In *Westmoreland,* our Supreme Court discussed the standard of review that the judiciary is to use when reviewing an arbitrator's award. The Supreme Court determined that the essence test which "set forth a clear two-prong approach to judicial review of grievance arbitration awards" is the standard of review our judiciary is to use. *Id.,* —— Pa. at ——, 939 A.2d at 863. The Supreme Court further determined as follows:

> [T]he United States Supreme court has recognized that courts should not enforce an arbitration award that contravenes public policy. *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers,* 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). This exception is grounded in the general rule that a court will not enforce a contract which is unlawful or in violation of public policy. *United Paperworkers Int'l Union v. Misco,* 484 U.S. 29, 42, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). As articulated in *W.R. Grace,* the public policy must be "well defined and dominant and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)). If the contract as interpreted by the arbitrator violates some explicit public policy, then the award cannot be enforced. *Id.* Moreover, "the violation of such a policy must be clearly shown if the award is not to be enforced." *Misco,* 484 U.S. at 43, 108 S.Ct. 364, 98 L.Ed.2d 286; *See also Eastern Associated Coal Corp. v. United Mine Workers of America, District 17,* 531 U.S. 57, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000). Of course, the burden to establish such a violation rests with the party asserting the public policy exception.

*Westmoreland,* —— Pa. at ——, 939 A.2d at 863–864. The Supreme Court concluded as follows:

> [T]oday we reaffirm the two-prong essence test as articulated in [*State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA),* 560 Pa. 135, 743 A.2d 405 (1999) ] *Cheyney University.* We conclude, however, that the essence test should be subject to a narrow exception by which an arbitrator's award will be vacated if it is violative of the public policy of the Commonwealth. While the core functions exception as articulated in *City of Easton [v. AFSCME, Local 447,* 562 Pa. 438, 756 A.2d 1107 (2000) ] attempted to set forth such a standard, we find, for the reasons stated above, the core functions exception is insufficiently precise, and raises serious questions regarding the jurisdiction to utilize arbitration as well as concerns regarding the potentially limitless reach of the exception as stated. Rather, like our adoption of the federal essence test for purposes of PERA, we conclude that the federal public policy exception is appropriately applied to arbitrator's awards arising under PERA as well. We believe that such a public policy exception constitutes a reasonable accommodation of the sometimes competing goals of dispute resolution by final and binding arbitration and protection of the public weal and is more consistent with our recent case law in this area. [*City of Philadelphia* ] *Office of Housing and Community Development [v. American Federation of State County and Municipal Employees, Local Union No. 1971,* 583

Pa. 121, 876 A.2d 375 (2005)]. **Thus, we reject the core functions exception to the essence test and supplant it with the public policy exception to the essence test.**

More specifically, we hold that upon appropriate challenge by a party, a court should not enforce a grievance arbitration award that contravenes public policy. Such public policy, however, must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. *Eastern Associated Coal; cf. Officer (sic) of Housing and Community Development.* (Emphasis added and footnote omitted).

*Westmoreland,* 595 Pa. at 665–66, 939 A.2d at 865–866. Thus, a court's standard of review is the "essence test," a standard calling for great deference to the arbitrator's interpretation of the CBA. The "essence test" is comprised of a two-prong analysis. "First, it must be determined whether the issue submitted to arbitration, as properly defined, is encompassed within the terms of the collective bargaining agreement ... [and] [s]econd, the arbitrator's award must be rationally derived from the collective bargaining agreement." *Allegheny County Airport Authority v. Construction General Laborers and Material Handlers Union, 1058,* 874 A.2d 1250, 1254 (Pa.Cmwlth.2005) (quoting *Cheyney University*).[4]

■ The trial court found that the Arbitrator's award failed to meet the second prong of the analysis, that the award was not rationally derived from the CBA. The trial court did so by applying the 'core functions' exception to the essence test. After the trial court issued its opinion, however, the Pennsylvania Supreme Court rejected and overruled the previously permitted 'core functions' exception to the essence test and supplanted it with a 'public policy' exception. *Westmoreland.*

The County contends that the Arbitrator's award ignored critical admissions of the Grievant, ignored the criminal law implications of those admissions, ignored the CBA's language which underscored the importance of management's ability to rigorously control who would be a Mercer County corrections sergeant, ignored the security concern reflected in Article II of the CBA which authorized management "to carry out the customary functions of management, particularly any action management deems required for the enforcement of safety, control and conduct of employees and prisoners at the jail," ignored the statutory mandate at Sections 1 and 2 of the Act of May 16, 1921, P.L. 579, *as amended,* 61 P.S. §§ 408–409, that county prisons be operated so as to insure prisoner safekeeping, and ignored the large body of state and federal law which argues for adjudicatory deference to the administrative decisions of prison management.[5]

**4.** Before the trial court, the parties agreed that the issue submitted to arbitration was encompassed within the terms of the CBA. Thus, the trial court did not need to address that prong of the test and, therefore, we need not address it either.

**5.** The County, in its Supplemental Brief to our court, contends that Weir violated the Crimes Code, 18 Pa.C.S. § 4904 (unsworn falsification to authorities), 18 Pa.C.S. § 903 (criminal conspiracy) and 18 Pa.C.S. § 4911

(tampering with public records or information). The County states that Weir implicated the previous aspects of the Crimes Code when he deliberately left out of his reports any reference to suggesting to an inmate that he would not write him up if he admitted to Grievant that he had stolen the contraband. However, the Arbitrator specifically found that Grievant did not "engage in any criminal act or hinder apprehension." A.A. at 8; R.R. at 84a. A review of the above statutes also

In *Misco*, an employee was arrested in the back seat of his car while in his employer's parking lot with marijuana smoke in the air and a lighted marijuana cigarette in the front seat ashtray. The employee was discharged and the matter proceeded to arbitration. The arbitrator found that there was insufficient evidence to prove that the employee was using or in possession of marijuana on the employer's property. The District Court vacated the award as against public policy and the Court of Appeals affirmed. The United States Supreme Court reversed and reinstated the arbitrator's award finding that:

> We cautioned, however, that a court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general consideration of supposed public interests.'" *Ibid.* [6] (quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945)).

\* \* \*

A refusal to enforce an award must rest on more than speculation or assumption. In any event, it was inappropriate for the Court of Appeals itself to draw the necessary inference. To conclude from the fact that marijuana had been found in Cooper's car that Cooper had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in factfinding about Cooper's use of drugs and his amenability to discipline, a task that exceeds the authority of a court asked to overturn an arbitration award. The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe Cooper and to be familiar with the plant and its problems. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task.... Had the arbitrator found that Cooper had possessed drugs on the property, yet imposed discipline short of discharge because he found as a factual matter that Cooper could be trusted not to use them on the job, the Court of Appeals could not upset the award because of its own view that public policy about plant safety was threatened. (Emphasis in original).

*Misco*, 484 U.S. at 43–45, 108 S.Ct. 364.

The trial court sustained the appeal of the arbitrator's award because it found that the Grievant was guilty of misconduct for permitting the inmate to be alone in the medical room with the nurse, for filing an inaccurate or incomplete report about it and for telling the inmate that he would not write him up if he confessed to the theft of the missing tobacco.

■ The trial court relied upon the admission by Grievant that he permitted the nurse to be alone in the medical room with an inmate to constitute misconduct that

---

reveals that the Arbitrator had a rational basis for finding that Grievant's acts would not amount to a violation of any of the above statutes. Also, although Grievant was charged in his termination letter with violations of three different sets of rules and regulations of the Jail, there was no reference to the Crimes Code. The Arbitrator obviously accepted the Grievant's testimony as credible and found no violation of the CBA that constituted just cause for discharge. If it was error for the Arbitrator not to detail in his opinion the possible criminal implications in greater length, it was harmless error.

6. *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. 2177.

violated prison policy.[7] The County, however, did not list as a reason in its termination letter that Grievant was being fired for allowing an inmate to be alone with the nurse. Further, the County did not establish before the arbitrator that there was a prison policy prohibiting an inmate to be alone with the nurse. The trial court ignored evidence of mitigation. Grievant testified that at the time of the incident, he was able to see the nurse at all times while she was alone with the inmate, that he did not feel it was necessary to put another guard on such duty, that he was not aware of any such policy and, in fact, it was a past practice, in that he had seen other sergeants permit it before. N.T. at 205; R.R. at 290a. The Arbitrator accepted the Grievant's testimony as credible and determined the conduct was not just cause for discharge or even loss of pay. The trial court erred in drawing an inference of wrongdoing from facts not charged as a reason for termination and then concluding that such misconduct was just cause for discharge. "[T]he essence test . . . admonishes that courts should not become embroiled in the merits of an arbitration. . . ." *Westmoreland*, 595 Pa. at 667, 939 A.2d at 866.

■ Grievant admitted telling inmate Anderson that he would not report him if he admitted that he had taken the contraband. The Arbitrator found that when Grievant originally interrogated Anderson that the inmate denied stealing the tobacco contraband, so Grievant was unable to determine immediately who stole the tobacco because two other inmates had been in that room that Sunday besides Anderson. It was not until later, when Grievant was able to ask the nurse about Anderson's actions, that Grievant concluded that Anderson was the likely suspect. When he next interrogated Anderson, Grievant obtained a confession after telling the inmate he would not report him. The County never established that this interrogation technique violated any prison regulations. The Arbitrator found the Grievant credible and that his conduct did not merit a discharge or a loss of pay.[8] The trial court ignored the mitigation testimony of Grievant which had been found credible and determined that Grievant committed misconduct and that such misconduct was just cause for dismissal. Even though the trial court disagrees with the Arbitrator's determination of the facts, the trial court is not supposed to become involved in the merits of the arbitration. *Cheyney University*.

■ Grievant's report of May 16th, referring to a male officer being in the room with the nurse, was the basis for the charge of falsification of reports and filing of an inaccurate and incomplete report. Grievant had previously admitted that there was no guard in the medical room at the time of the incident on May 15th. Grievant explained that the statement in the report that a guard was present referred to the treatment that took place on the date the report was typed (May 16th) to indicate that Grievant had changed the procedure after talking to Morganstern.

7. Grievant testified that he had seen three or four other sergeants permit an inmate to be alone with a visiting female nurse, that he could see the nurse from his position outside the medical room and that he was not aware that there was such a policy until after the incident of May 15, 2005, when Officer Steen told him about the policy. N.T. at 208; R.R. at 293a. The County did not cite to any such written policy in the Standing Orders it introduced as exhibits.

8. Grievant had never been disciplined prior to this incident in his six and one half years of employment as a corrections officer in the Jail and had received the Officer Of The Year Award for the year 2002. R.R. 278–279.

Grievant conceded that he should have submitted two separate reports. The trial court accepted "this highly questionable position as true," but then determined that Grievant had committed misconduct by filing an inaccurate report. The trial court ignored Grievant's mitigation testimony which was accepted by the Arbitrator, drew inferences from Grievant's testimony and concluded that the report was inaccurate, which constituted just cause for discharge.[9] Such factfinding exceeds the authority of a court reviewing an arbitration award. *Misco.* The trial court "must only determine if the award is indisputably and genuinely without foundation in or fails to logically flow from the collective bargaining agreement." *Westmoreland,* 595 Pa. at 667, 939 A.2d at 866.

■ The parties received the benefit of their bargain, as the Arbitrator was asked to interpret the "just cause" provision and did so consistent with the CBA. It is the arbitrator's role to interpret the terms of the CBA. *Office of the Attorney General.* The Arbitrator's award explained the reasons for interpreting the evidence and had a rational basis for determining that Grievant's conduct did not amount to "just cause" for dismissal. The Arbitrator determined that the County failed to prove that the Grievant acted as charged. The trial court should not become involved in the merits of the arbitration. *Westmoreland.* Regardless, the trial court based its opinion on the core functions test, which test has since been overruled. *Id.* The

Arbitrator's award is rationally derived from and draws its essence from the CBA. It is, therefore, now necessary to ascertain if the County has produced evidence of an exception to the essence test on the basis that the award is a violation of public policy.

Since the *Westmoreland* decision occurred after the decision of the trial court and after briefs were initially filed with this court, we authorized both parties at argument to submit supplemental briefs addressing the public policy exception. Thus, we will now address whether or not the Arbitrator's award reinstating Grievant violated a well defined and dominant public policy ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. *Westmoreland.*

■ The only exception to the essence test is whether the Arbitrator's award violated public policy.[10] There is no public policy that mandates the discharge of all employees who are alleged to have committed a misconduct. *See AFSME v. State of Illinois,* 124 Ill.2d 246, 124 Ill.Dec. 553, 529 N.E.2d 534 (1988) (no public policy mandating the discharge of all employees found guilty of mistreatment of a service recipient when an arbitrator expressly finds that the grievants were exemplary employees, when punishment was imposed and where no nexis exists between the infraction and the patient's death).

**9.** Our Supreme Court determined in *Office of the Attorney General v. Council 13, American Federation of State, County & Municipal Employees, AFL–CIO,* 577 Pa. 257, 844 A.2d 1217 (2004), that "misconduct ... is not the equivalent of a finding of just cause for discharge." *Id.* 577 Pa. at 267, 844 A.2d at 1223. Further, the Arbitrator is permitted to consider other factors in determining whether there was just cause for a discharge. What consti-

tutes "just cause" would depend on the work setting and any special circumstances. *Id.*

**10.** "[C]ourts should play an extremely limited role in resolving such disputes.... [A] court will vacate that award only where it 'indisputably and genuinely is without foundation, or fails to logically flow from, the [CBA].'" *Office of the Attorney General,* 577 Pa. at 266, 844 A.2d at 1223 (quoting *Cheyney University*).

■ Since the County is the party asserting the public policy exception, the burden of establishing such a violation rests upon it. *Westmoreland,* 595 Pa. at 862–63, 939 A.2d at 864. The County has asserted violations of the SOP Manual, the Standing/Post Orders and the Code of Ethics of the Jail, which are essentially the work rules and a very important part of the operation and management of the Jail. No public policy of the Commonwealth of Pennsylvania, however, has been identified by the County, let alone one that is well-defined, dominant and ascertained by reference to the laws and legal precedents, as opposed to being ascertained from general considerations of supposed public interests, that supports reversing the Arbitrator's award.

The Arbitrator's award was rationally derived from and drew its essence from the CBA and did not violate public policy.

Accordingly, we must reverse the decision of the trial court and reinstate the Arbitrator's award.

### ORDER

AND NOW, this 8th day of April, 2008 the Order of the Court of Common Pleas of Mercer County in the above-captioned matter is reversed and the arbitration award is reinstated.